Siddoway, J.
¶46 (concurring in the result) We lack information on the magnitude and complexity of the work involved for CliftonLarsonAllen LLP (CLA) to perform the annual Head Start program compliance it promised to perform for Enterprise for Progress in the Community (EPIC).[1] Its base annual audit fee ranged from $23,600 to $29,500 between 2006 and 2011. Depending on the complexity of the compliance work and the aptitudes of EPIC’s own employees, timely determining whether CLA committed malpractice might have required EPIC’s board of directors to hire an auditor to audit the auditor. If so, I am unwilling to say as a general matter that the contractual limitations period in CLA’s engagement letters is reasonable.
¶47 Nor do we need to. The undisputed evidence establishes that EPIC’s causes of action against CLA accrued in *278 time for it to have asserted its claims within the contractual limitations period. Where that is the case, there is no need to determine whether the provision should be deemed waived.
¶48 Where a limitations provision might unreasonably bar a claim before it can be asserted, the result, announced in our Supreme Court’s 1910 decision in Sheard v. United States Fidelity & Guaranty Co., is that the court will infer an intent to waive the provision as to such claims. 58 Wash. 29, 34-35, 107 P. 1024 (1910). In other words, a party cannot attack a contractual limitations period as “facially unreasonable”—instead, the limitation provision is deemed waived in cases where it would be unreasonable as applied. We glean this from Sheard’s adoption, as “the correct rule of construction,” of the rule announced by the Iowa Supreme Court in Longhurst v. Star Insurance Co.:
“If, with reasonable diligence, the value [of the insured interest] cannot be legally ascertained in time to bring an action on the policy within a year from the date of the loss, then it follows (unless you wish to impute a dishonest purpose on the part of the company), that in granting such policy they intended, to waive, in this class of insurable interest, the condition which limits the right of action on the policy to twelve months. By putting this construction upon the contract of insurance, you preserve the upright intent of the company intact. Whereas if you put the other construction upon it, you . . . judicially determine, that the company granted a policy for a valuable consideration paid, which at the time, they had reason to believe, would be no risk to them and no protection to the insured, and thereby obtained money for themselves under false pretenses. ... It is the business of the court in construing the contract, to give effect, if possible, to the real intent and expectations of the parties. That can be done only in this case by holding that the fifteenth condition of the policy under discussion, is not applicable to this particular class of insurable interest, and that when the defendant consented to take risks of this kind, it either intended to waive the limitation, or have it to commence running from the date that the value of the mechanic’s lien should, be judicially ascertained.”
*279 Sheard, 58 Wash. at 34-35 (emphasis added) (quoting 19 Iowa 364, 371-72 (1865)).
¶49 “[A] claim [generally] accrues when a party has the right to apply to a court for relief.” Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc., 166 Wn.2d 475, 485, 209 P.3d 863 (2009). Generally, if the plaintiff is aware of some injury, beyond nominal damage, the statute of limitation begins to run even if he does not know the full extent of his injuries. Steele v. Organon, Inc., 43 Wn. App. 230, 234, 716 P.2d 920 (1986).
¶50 As the majority illustrates, EPIC had the right to apply to a court for relief many months before the contractual limitation provision barred its claim. Because the provision did not unreasonably bar this claim before it could be asserted, there is no need to examine its reasonableness further.
¶51 I concur in the result.
Review denied at 189 Wn.2d 1021 (2017).

 The 2009 engagement letter, for instance, stated in relevant part:
In addition to our report on Client’s financial statements, we will also issue the following types of reports:

• Reports on compliance with laws, regulations, and the provisions of contracts or grant agreements. We will report on any noncompliance which could have a material effect on the financial statements and any noncompliance which could have a direct and material effect on each major program.
Clerk’s Papers at 55. The agreement identified “Head Start 93.600’’ as the only federal financial assistance program that EPIC participated in for purposes of the audit. Id. It went on to provide that its report would address “material errors, fraud, abuse, violations of compliance obligations, and other responsibilities imposed by state and federal statutes and regulations.’’ Id.