[No. 15330. Department One. August 6, 1919.]

COLUMBIA SECURITY COMPANY, *Appellant*, v. AETNA ACCIDENT & LIABILITY COMPANY, *Respondent*, J. M. SCHUSTER, *Defendant*.[1]

INDEMNITY (7) — PRINCIPAL AND SURETY (52) — BUILDING CONTRACTS — BOND — LIMITATIONS. A limitation in a contractor's bond requiring suit to be commenced within six months after the time fixed for the completion of the work is not controlling where there was a valid excuse for delay; and the surety company is foreclosed from raising the point where it induced delay until lien claims could be adjudicated in pending litigation.

INDEMNITY (10-1)—PRINCIPAL AND SURETY (47)—DEFENSES. It is no defense to an action upon a contractor's bond that the principal was not made a party, as required by the bond, where an order was made and complied with making him a party and an unsuccessful effort made to serve him, and no further insistence on the point was made, although the surety produced him as a witness.

SAME. A change in the plans and specifications increasing the cost more than twenty per cent, in violation of the terms of the contractor's bond, is not a defense to the action, where the extra liability was incurred through the unauthorized act of the architect without the owner's knowledge, and beyond the powers conferred in the contract.

SAME. Such a change in the plans and specifications will not defeat an action on the bond where the same was known and explained to surety's agent, when application for the bond was made, the plans and specifications being already abandoned before the bond was signed.

[1]Reported in 183 Pac. 137.

PRINCIPAL AND AGENT (50)—UNDISCLOSED PRINCIPAL—RIGHT OF ACTION. The fact that the general manager and agent of the owner was named as the obligee in a contractor's bond as the owner does not preclude the actual owner from bringing an action on the bond in its own name.

Appeal from a judgment of the superior court for Spokane county, Webster, J., entered January 23, 1919, upon findings in favor of the defendant, in an action on contract, tried to the court. Reversed.

*O. C. Moore*, for appellant.
*Post, Russell & Higgins*, for respondent.

MITCHELL, J.—T. C. Elliott, his wife, and certain of their children own all the stock in the plaintiff corporation, which was organized for the purpose of handling their property. T. C. Elliott, as secretary, treasurer and manager thereof, handled and directed its business affairs. It was the owner of real property, including a store building in Pullman, Washington, and on May 25, 1916, through its manager, entered into a written contract with one J. M. Schuster for the remodeling of the building, according to plans and specifications provided, at the agreed price of one thousand two hundred dollars ($1,200). By the terms of the contract, the contractor was to provide all material and labor and complete the work by June 15, 1916. As a part of the same transaction, it was understood the contractor should furnish a bond with surety to assure the faithful performance of the contract, and, accordingly, upon the application of the contractor, for a consideration paid, the Aetna Accident & Liability Company, a corporation, as surety, with Schuster as principal, made and delivered the bond, in the sum of one thousand two hundred dollars ($1,200), upon which this action was brought. The builder's contract and the bond run to T. C. Elliott, who is designated as the

owner of the building. The work was finished June 15-17, 1916. After payment to the contractor of nine hundred sixty dollars ($960), plaintiff, to protect its property and on the order of the contractor, was compelled to pay, but without a suit, a materialman three hundred forty dollars and twenty-seven cents ($340.-27); and further, a lien foreclosure suit by another materialman against this plaintiff, the contractor and T. C. Elliott, in which there was a judgment foreclosing the lien, together with the necessary expenditure by this plaintiff for its own attorney's fees and other charges in that suit, compelled plaintiff to pay the sum of six hundred two dollars and nineteen cents ($602.19), making altogether seven hundred two dollars and forty-six cents ($702.46) in excess of the contract price, for the recovery of which, with interest, this suit was brought. The case was tried before the court without a jury, and resulted in a judgment that plaintiff take nothing by the action.

In addition to general denials, respondent, the Aetna Accident & Liability Company, answered the complaint by three affirmative defenses, each of which withstood a general demurrer in the trial court and was then traversed by a reply.

The first affirmative defense is to the effect that the action, which was started on June 12, 1918, was not commenced within the time limit fixed by the terms of the bond. The defense is based on the provision in the bond that no action on it shall be had or maintained against the surety unless it be brought, and process served on the surety, within six months after the date or time fixed in the contract for the completion of the work mentioned therein, which, as already noticed, was June 15, 1916. The evidence shows that, shortly after the work was completed, Elliott notified respondent at its home office in Hartford, Connecticut, and its

local agent at Pullman, Washington, that certain persons, naming them, made claims for material furnished in amounts specified, which with payments already made to the contractor would substantially exceed the contract price, and that respondent would be held responsible therefor under the terms of the bond; and that the contractor also made a charge for the same, claiming they were extras ordered by the architect, concerning which the notice stated they were without authority or the knowledge of the owner. Thereafter considerable correspondence took place between the parties, including notice to respondent that liens had been filed and that, if suits were brought, its assistance in defense thereof would be requested; and later on, within six months from the date fixed for the completion of the work, notice was given respondent that lien foreclosure suit had been filed, inclosing a copy of the summons and complaint, and requesting respondent to assume or assist in the defense. Respondent declined to take part in the suit, but at its request was kept posted as to its progress, including the judgment obtained by the plaintiff therein. After the judgment, which was paid by this appellant, appellant's demands that respondent pay the amount thereof were unavailing on the score that, as Schuster was thinking of appealing the case, respondent desired to wait until his attitude in that regard was settled. In this respect, respondent's admitted adjusting agent, Mr. Comfort, on January 14, 1918, wrote requesting a delay in taking any steps against the surety company, and further said:

"Before making any payment, our attitude is that the difficulty between Schuster and Elliott should be definitely settled so that Mr. Schuster will have no handling of the collateral."

And, again, on May 12, 1918, one month before this suit was brought, the respondent from its home office wrote:

"We should expect to hear from Mr. Comfort in a short time and you have nothing to lose by waiting until we are a little more fully informed concerning the entire matter."

The reasonableness and enforceability of the provision of such a bond, limiting the time within which an action shall be commenced for a breach, depend not alone upon the words of the bond and the contract, but also upon the facts of the particular case. The actual breach occurs when liens are filed and established by the judgment of a court. The limitation for commencing suit on the bond, in its strict sense, is not controlling, in spite of a reasonable and valid excuse for delay beyond that time. *Beebe v. Redward,* 35 Wash. 615, 77 Pac. 1052; *Ovington v. Aetna Indemnity Co.,* 36 Wash. 473, 78 Pac. 1021; *Sheard v. United States Fidelity & Guaranty Co.,* 58 Wash. 29, 107 Pac. 1024, 109 Pac. 276.

As alleged by appellant in its reply to this defense, after setting out the facts, respondent by its conduct has foreclosed itself to any right it might otherwise have under this provision in the bond.

The second affirmative defense is that Schuster, the principal in the bond, was not made a party to the action. The bond provides "that the principal shall be made a party to any action, suit or proceeding had or maintained against the surety on this instrument," and it is contended the provision is a condition precedent to the bringing and maintaining of the action. At the commencement, Schuster was not made a party to the action, but in the process of settling the pleadings the court, having its attention called to this defense, made and entered an order that Schuster be

made a party defendant to the action. The order was complied with, and afterwards, prior to the trial, an unsuccessful effort was made through the office of the sheriff of the county in which the suit was pending to get service of the summons on Schuster. Thereafter no further insistence on the point was made by respondent in the trial court, although for the trial respondent procured the attendance of Mr. Schuster and called him as a witness. Under the circumstances, respondent may not complain because of lack of service upon the principal, even if otherwise it could insist upon the provision of the bond requiring the principal to be made a party to an action against the surety, in the face of another provision of the bond that the principal and the surety bind themselves, jointly and severally.

The third affirmative defense is that the plans and specifications were changed, whereby the cost of the work was increased more than twenty per cent, without the written consent of the surety, and in violation of one of the conditions of the obligation "that no change shall be made in the plans, specifications, terms, covenants and conditions of such contract which shall increase the amount to be paid the principal more than twenty per centum of the penalty of this instrument without the written consent of the surety." In our view, the proof answers this contention in two ways.

(1) The changes and additional cost of more than twenty per cent arose, directly and indirectly, almost exclusively by order of the architect requiring, during the course of the construction, larger iron beams or lintels installed than those called for in the plans and specifications. It is clear that appellant or its manager knew nothing about the change until the larger

beams were already on the ground and the contractor engaged in installing them, at which time, because of the lien statutes, liability to the one furnishing them had already accrued; and within a few days, upon completion of the work, on learning of the purpose to make an extra charge, or charge beyond the contract price, appellant promptly protested to respondent, and later resisted the lien foreclosure suit, unsuccessfully, however, manifestly because, under the lien statutes, an architect or contractor having charge of the construction or repair of a building is held to be the agent of the owner for the purpose of the establishment of a lien for material furnished.

The builder's contract and the specifications are made a part of the terms and conditions of the bond. The only provisions of the instruments claimed by respondent to have any bearing upon the authority of the architect to order changes and bind the appellant are as follows:

Art. II of the contract:

"It is understood and agreed by and between the parties hereto that the work included in this contract is to be done under the direction of the said architect."

Art. III of the contract:

"The contractor shall provide sufficient, safe and proper facilities at all times for the inspection of the work by the architect or his authorized representatives; shall, within twenty-four hours after receiving written notice from the architect to that effect, proceed to remove from the grounds or buildings all materials condemned by him, whether worked or unworked, and to take down all portions of the work which the architect shall by like written notice condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications, and shall make good all work damaged or destroyed thereby."

Portions of the specifications as follows:

"All material must conform to the specifications . . . The work shall be under the supervision and direction of the architect and his decision in matters concerning the intent and meaning in interpreting drawings and specifications shall be final and binding . . . The contractor shall call the architect's attention to any improper design or apparent discrepancy in drawings before progressing with the work."

An architect is not, simply as such, a general agent. He and all third persons dealing with him are bound by the general rules of agency. In the present case, he had no authority to bind appellant beyond the terms of the contract with Schuster. The authority conferred was limited and defined. It was special and not general. The work to be done under the direction of the architect was the work mentioned in the contract, which in the respect in question was made definite and certain by the specifications. His power to condemn and order taken down and removed from the grounds all material as unsound or improper, or as in any way failing to conform to the drawings and specifications, falls far short of giving him any right to recast the drawings and specifications, upon a matter already perfectly clear and explicit, by substituting something else so increasing the total cost that, standing alone, would threaten, if not defeat, his employer's rights under the literal terms of a bond given to indemnify and assure the employer that the cost of the work would not exceed the amount mentioned in the contract. It was provided that all materials should conform to the specifications, that is, the specifications which were a part of the contract; and, while it was agreed that the decision of the architect in interpreting the intent and meaning of the drawings and specifications of the work under his supervision should be

final and binding, this cannot be considered as creating a sphere wherein the architect could, *sua sponte,* make radical changes in the specifications, already precise and certain, to the substantial disadvantage of the owner of the building. Contrary to the contention of respondent, the rule applicable here is given in 6 Cyc. 29, quoted with approval in *Schanen-Blair Co. Marble & Granite Works v. Sisters of Charity of the House of Providence,* 77 Wash. 256, 137 Pac. 468, as follows:

"The mere fact that a person is employed as an architect does not constitute such person a general agent of his employer, his powers as agent being limited by the contract entered into between them. Thus, unless specially authorized, he is not entitled to change, alter, or modify the contract entered into by the builder and his employer; nor has he any authority to bind the owner by contracts for any work done upon or materials furnished for the structures concerning which he is employed; nor is he entitled to receive notice of an assignment of payments accruing on the contract so as to charge the owner with notice thereof."

(2) The application for the bond was made to one Chapman, respondent's agent, on June 3, 1916, and the bond was executed and delivered on June 13, 1916, two or three days before the work was finished. On June 5, 1916, respondent's agent, already provided with the plans and specifications, regarding the application for a bond, visited the contractor at the building and made inquiries into the matter. The agent was not a witness at the trial, but as to a part of what occurred at the time of the agent's visit for writing the bond, Schuster testified as follows:

"Q. Did you confer with him? Did you go to Mr. Chapman himself? A. I went to Mr. Chapman, yes, and made application for the bond. Q. You advised him fully in regard to the work that was being done,

and what the contract called for? A. Most decidedly, sir. . . . Q. Just tell me what he did do about it? You talked to Mr. Chapman about it? A. I had to get the bond. I just went to him and made the application, told him what I was going to do, and what the bond was to cover. . . . Q. You told Mr. Chapman that these changes had been made, a departure from the contract at the time he issued this bond? A. I certainly told him because he came down to the building when we were making the change. . . . Q. What objection did he make? A. He didn't make any objection. Q. He had seen the specifications and the plans at the time? A. He had seen the plans and specifications. Had to have them to get the bond. . . . Q. But you did let Mr. Chapman, as agent of the bonding company, know the facts? Mr. Russell: I object to that as repetition. He has answered that question two or three times. I think Mr. Moore is trying to get him to answer it a different way. The Court: Overruled. Q. Isn't that true? A. I tell you Mr. Chapman was there I know when we were making the change, and talked about it. He wanted to know why Mr. Jacobs [the architect] made such a mistake. Of course in order to clear myself I told him and everybody that Mr. Jacobs had, that he got the college engineer.''

By a quotation from *Thompson v. Metropolitan Building Co.,* 95 Wash. 546, 164 Pac. 222, respondent insists the applicable rule here is:

''It is well settled that mere silence on the part of a surety, when he is informed of a modification of the contract between his principal and the creditor or that a new obligation has been substituted in lieu of the original one, does not imply assent on his part. In order to bind him to the new undertaking, it is not sufficient that he passively acquiesce; he must actively consent to be bound by the terms of the new agreement.''

But that rule is not applicable here. It is applicable in the case of a subsequent modification by the principal and creditor of an outstanding contract thereto-

fore signed by them and the surety; while, in the present case, the surety had not signed the contract, which, so far as the surety was concerned, had already been modified, and of which its agent was advised at the time he was engaged in the serious business of making the contract for his principal as surety or indemnitor. Respondent will not be permitted to say it received compensation upon the basis of drawings and specifications already abandoned, within its knowledge, at the time of making its contract, or otherwise than according to the changes being followed and of which it learned while seeking information for the purposes of its undertaking—the latter, not the former, was its contract.

Besides the affirmative answers referred to, it is contended by respondent that appellant can in no event have the benefit of the assurance contained in the bond, because it is not named as the beneficiary therein. At least, the bond was meant to protect the owner; that was the object to be accomplished. It mentions T. C. Elliott as owner of the building. He, or even the actual owner, for whom Elliott was acting as agent, was but the obligee, while the risk assumed by respondent was founded upon its trust and confidence in the conduct and ability of Schuster. The situation is controlled by the rule of law relied on in the case of *Pacific Power & Light Co. v. White,* 96 Wash. 18, 164 Pac. 602, Ann. Cas. 1918B 125, well stated in 2 C. J. 873, as follows:

"As a corollary to the principle that the rights of the other contracting party are not affected by the disclosure of a theretofore unknown principal, it is a well established general rule that, where an agent on behalf of his principal, enters into a simple contract as though made for himself, and the existence of the principal is not disclosed, the contract inures to the benefit of the principal who may appear and hold the other party to the contract made by the agent. By appear-

ing and claiming the benefit of the contract, it thereby becomes his own to the same extent as if his name had originally appeared as a contracting party, and the fact that the agent has made the contract in his own name does not preclude the principal from suing thereon as the real party in interest; . . ."

The record shows appellant proved its case; and concluding that none of the defenses was established, the judgment is reversed with directions to the lower court to enter judgment for appellant for the amount demanded in its complaint, with interest from the date of the commencement of the action.

HOLCOMB, C. J., TOLMAN, MAIN, and MACKINTOSH, JJ., concur.